# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

GANNON INTERNATIONAL, LTD, et al.,    )
    )
    Plaintiffs,    )
    )
    v.    )    No. 4:07-CV-31 CAS
    )
LEXINGTON INSURANCE COMPANY,    )
et al.,    )
    )
    Defendants.    )

## MEMORANDUM AND ORDER

This diversity matter is before the Court on several motions seeking the exclusion of expert testimony pursuant to Federal Rule of Evidence 403 or Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). No party has requested an evidentiary hearing. The parties have submitted an extensive evidentiary record including exhibits and deposition testimony. Accordingly, the Court finds that, where appropriate, it can make a proper Daubert analysis without the need for an evidentiary hearing or oral argument.

**Background**.

The plaintiffs, Gannon International, Ltd., West Pointe Apartments, LLC, and Gannon Partnership 19, L.P., are the current and former owners of the West Pointe Apartments ("West Pointe"), a multi-unit apartment complex consisting of seventy-two buildings located on fifty-six acres in west St. Louis County, Missouri. This is an action for breach of contract, vexatious refusal to pay and declaratory judgment against insurance companies that insured the plaintiffs' property against losses for, among other things, physical loss, property damage, business interruption and rental value loss. Plaintiffs allege that the roofs and other parts of various buildings at West Pointe were severely

damaged by wind, rain and hail during storms occurring on October 24, 2001, March 9, 2002 and April 18, 2002, but the defendants have refused to pay under the applicable policies.

The plaintiffs purchased a "layered" insurance program for property coverage. The primary layer, with a policy limit of $1 million, was issued by defendant Lexington Insurance Company ("Lexington"). The first excess layer is for losses between $1 million and $4 million. Defendants Arrowood Surplus Lines Insurance Company, United States Fire Insurance Company and TIG Insurance Company (collectively referred to as the "Excess Carriers") would be liable for an equal portion of any loss, in any one occurrence, between $1 million and $4 million. The Excess Carriers' interests and exposure in the litigation are identical.

**Rule 403 Standard**.

Rule 403 of the Federal Rules of Evidence provides for the exclusion of relevant evidence on the grounds of prejudice, confusion or waste of time: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403, Fed. R. Evid.

Under Rule 403, the Court is required to weigh the probative value of the evidence against the prejudicial or other negative effect if it is admitted, to determine if the former is substantially outweighed by the latter. See Jones v. Board of Police Comm'rs, 844 F.2d 500, 505 (8th Cir. 1988). "Rule 403 does not offer protection against evidence that is merely prejudicial in the sense of being detrimental to a party's case. The rule protects against evidence that is *unfairly* prejudicial." United States v. McCourt, 468 F.3d 1088, 1092 (8th Cir. 2006) (quoting United States v. Johnson, 463 F.3d 803, 809 (8th Cir. 2006) (emphasis added in McCourt)). Unfair prejudice means an undue tendency

to suggest decision on an improper basis. United States v. Adams, 401 F.3d 886, 899-900 (8th Cir. 2005) (quoting United States v. Lupino, 301 F.3d 642, 646 (8th Cir. 2002)). Evidence which is "so inflammatory on its face as to divert the jury's attention from the material issues in the trial" is unfairly prejudicial. Johnson, 463 F.3d at 809. Rule 403 permits the exclusion of evidence only if its probative value is "substantially outweighed" by the danger of unfair prejudice. United States v. Abodeely, 801 F.2d 1020, 1025 (8th Cir.1986).

**Daubert standard**.

The admission of expert testimony in federal court is governed by Federal Rule of Evidence 702. Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001). "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony." Weisgram v. Marley Co., 169 F.3d 514, 523 (8th Cir. 1999), aff'd, 528 U.S. 440 (2000). The Rule "favors admissibility if the testimony will assist the trier of fact." Clark ex rel. Clark v. Heidrick, 150 F.3d 912, 915 (8th Cir. 1998). Doubt regarding "whether an expert's testimony will be useful should generally be resolved in favor of admissibility." Id. (citation and internal quotation omitted).

In Daubert, the United States Supreme Court interpreted Rule 702 to require district courts to be certain that expert evidence based on scientific, technical or other specialized knowledge is "not only relevant, but reliable." Daubert, 509 U.S. at 589. The district court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert at 592-93.

The Eighth Circuit has explained that proposed expert testimony must meet three criteria to be admissible under Rule 702:

First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires . . . .

The basis for the third prerequisite lies in the recent amendment of Rule 702, which adds the following language to the former rule: '(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.' Fed. R. Evid. 702.

Lauzon, 270 F.3d at 686 (internal citations and punctuation omitted).

The Daubert decision lists several nonexclusive factors a court may examine in performing its "gatekeeper" role of screening expert testimony for relevance and reliability. These are: "(1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory has been generally accepted." Lauzon, 270 F.3d at 686-87 (internal citations and punctuation omitted). Additional factors which have been developed in subsequent cases include "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." Id. (citations omitted). The Daubert list of factors is not exclusive, and does not function as a definitive "checklist or test." Daubert, 509 U.S. at 593-94. Instead, the trial court retains great flexibility in customizing the analysis to fit the facts of each case. See Jaurequi v. Carter Mfg. Co., Inc., 173 F.3d 1076, 1083 (8th Cir. 1999).

**Discussion**.

     A. *Excess Carriers' Motion to Exclude Certain Opinions and Testimony of Plaintiffs' Expert Witness Robin Kessinger*

     The Excess Carriers state that Mr. Robin Kessinger, plaintiffs' Rule 30(b)(6) witness, is a project manager for Gannon Development who conducted an inspection of the roofs at West Pointe in February 2004. Plaintiffs designated Mr. Kessinger as an expert in this case to provide opinions as to the following: (1) the "repair, removal and replacement (installation) of membrane roofs such as those at issue in this case;" and (2) "the mechanics of installing new membrane roofs including without limitation the costs attendant thereto."

     The Excess Carriers seek to exclude all opinion and testimony by Mr. Kessinger on the following topics: (1) when the alleged damage that he observed occurred; and (2) any hail damage to roofs replaced by the plaintiffs in 2002 and 2003. The Excess Carriers assert that Mr. Kessinger's testimony on these topics will mislead the jury and any probative value his opinions and testimony may have is substantially outweighed by its prejudicial effect.

     The Excess Carriers assert that the relevant dates and facts are as follows: On October 24, 2001, a hail storm went through the St. Louis area, allegedly causing damage at the West Pointe property, which comprises a total of seventy-two buildings. The plaintiffs have records concerning roof installations only since 1993. Plaintiffs can identify the age of only thirty-two of the roofs, and forty of the roofs were installed before 1993, with their exact age unknown.[1]

     In 2002, plaintiffs replaced five roofs at West Pointe. In 2003, plaintiffs replaced four roofs at West Pointe. In February 2004, for the first time, Mr. Kessinger inspected the roofs at West Pointe for hail damage. In 2005, plaintiffs replaced five roofs at West Pointe. In 2006, plaintiffs replaced

---

     [1]West Pointe was built in four phases, at different times.

one more roof at West Pointe. This suit was filed in January 2007. The Excess Carriers state that plaintiffs are contending that all roofs and component parts at West Pointe had to be replaced as a result of the hail damage, including the roofs replaced in 2002 and 2003, which Mr. Kessinger admits no one inspected for hail damage before they were replaced.

### 1. Opinions and Testimony Concerning When the Damage Occurred

The Excess Carriers state initially that Mr. Kessinger was not designated as a causation expert or a hail expert, and that the complaint alleges all of the damage occurred on October 24, 2001. The Excess Carriers assert that Mr. Kessinger's testimony concerning when the damage occurred has no probative value because Mr. Kessinger (1) testified that he did not look at the roofs for hail damage until February 2004; (2) testified that when he did observe the roofs in February 2004, he simply assumed that any hail damage he observed occurred on October 24, 2001; (3) admitted there was no way to date the alleged hail damage he observed in 2004, and (4) admitted that hail storms occur in the St. Louis area on a yearly basis.

The Excess Carriers state that Mr. Kessinger was designated as an expert to offer opinions and testimony regarding repair, removal and replacement costs concerning the roofs, and not when the alleged damage occurred. The Excess Carriers assert that for the reasons stated above, Mr. Kessinger's opinions regarding when the alleged hail damage occurred would substantially prejudice them because it would confuse and mislead the jury as to the proper purpose and nature of Mr. Kessinger's testimony, and because the witness has no basis for offering the opinion.

The plaintiffs respond that Mr. Kessinger has an adequate factual basis to determine that the hail damage he observed in 2004 was caused by the October 24, 2001 hail storm. Plaintiffs state that Mr. Kessinger testified he personally observed hail damage to the roofs on three buildings in Phase

IV (Buildings 1, 2 and 14) and observed hail damage to four or five other roofs in the summer of 2002, although he testified that no one inspected all of the roofs until 2004. Plaintiffs further state that in addition to Mr. Kessinger's personal observations of the roofs, he saw photographs of the hail stones from the October 24, 2001 storm taken by John Kramm, a West Pointe maintenance employee, discussed the hail damage with Chris Marlo, another West Pointe maintenance employee who first contacted Mr. Kessinger about the hail storm, and inspected the damage to a fence immediately in front of the maintenance shop. Mr. Kessinger also testified that he was aware some of the roofs at West Pointe began to leak after the October 24, 2001 hail storm. Plaintiffs also assert that they have a HailTrax report which indicates that hail stones between 3/4 inch and 2 inches in diameter would have been "likely" at West Pointe, and hail stones equal or greater to 2 inches in diameter would have "potentially" hit the complex. The plaintiffs conclude that Mr. Kessinger's testimony concerning the date of the hail damage is relevant and probative, would not confuse or mislead the jury, and should be admitted.

The Court finds that the Excess Carriers' motion to exclude Mr. Kessinger's testimony concerning when the hail damage occurred should be denied. The motion asserts that this testimony is prejudicial because Mr. Kessinger lacks a factual basis from which to testify concerning the date of the damage, and that his testimony would confuse the jury. Plaintiffs have established that Mr. Kessinger testified he spoke with West Pointe employees who witnessed the hail storm on October 24, 2001, saw photographs of the hail stones that fell at West Pointe, inspected at least seven roofs in 2002, saw a fence at West Pointe that was damaged by hail, and was aware that roofs began leaking shortly after October 24, 2001. This testimony is sufficient to give Mr. Kessinger a factual basis to testify concerning the date of the damage, and it does not appear the testimony would

confuse or mislead the jury. Moreover, it is not contested that a major hail storm hit St. Louis on October 24, 2001. The Excess Carriers are free to vigorously cross-examine Mr. Kessinger concerning weaknesses they see in the factual basis for his testimony.

### 2. Opinions and Testimony Concerning Alleged Hail Damage to Roofs Replaced in 2002 and 2003

The Excess Carriers move to exclude Mr. Kessinger's testimony to the extent he would testify that five roofs were replaced in 2002 and four roofs were replaced in 2003 solely because of hail damage from the October 24, 2001 storm. The Excess Carriers state that Mr. Kessinger testified he did not recall looking for hail damage on any of the roofs, and he could not recall whether anyone else inspected the roofs for hail damage before they were replaced. The Excess Carriers contend that Mr. Kessinger's testimony lacks probative value because neither he nor anyone else looked at or inspected the roofs for hail damage until 2004, his testimony would be purely speculative, and any probative value his testimony does have would be substantially outweighed by its prejudicial effect.

The plaintiffs respond that Mr. Kessinger testified he was on each roof replaced in 2002 and 2003 prior to the replacement, and although he testified that he did not recall the extent of hail damage to the roofs replaced in 2002 and 2003, he consistently testified that he "did not recall," and did not testify that there was no damage.

With respect to the roofs replaced in 2002, Mr. Kessinger testified in his deposition that when he was asked if the roofs could be repaired or had to be replaced, he "probably would have done some type of an inspection and looked at the roof," Kessinger Dep. 75:2-5, he believes that he actually went up on the roofs and looked at them, although he has no specific recollection of doing so, and does not recall whether he inspected the roofs for hail damage. Id. at 75:1-78:6. Mr. Kessinger testified there was a "possibility" the maintenance director accompanied him to inspect one

roof with him, and while he might have gotten the maintenance staff's input on the conditions of the roof, he could not recall whether any maintenance staff had looked at the roofs before they were replaced. Id. at 77:12-78:1. When asked whether he was aware of anyone who inspected the 2002 roof replacement buildings for hail damage before the roofs were replaced, Mr. Kessinger testified that he could not recall. Id. at 78:2-6.

The Court will deny the Excess Carriers' motion to exclude Mr. Kessinger's testimony about the roofs replaced in 2002. Although Mr. Kessinger's deposition testimony indicates he has little recollection about being on the roofs or inspecting the hail damage, he does testify that he believes he was on the roofs. This gives Mr. Kessinger's testimony some factual basis to remove it from the realm of speculation, and the Excess Carriers have not explained in what manner his testimony would be prejudicial to them. If Mr. Kessinger testifies at trial about hail damage to the roofs replaced in 2002 in a manner different than at his deposition, the Excess Carriers will be free to attempt to impeach him with the deposition testimony.

The motion will also be denied with respect to the roofs replaced in 2003. Mr. Kessinger testified that he remembered going up on each of the roofs that were replaced in 2003, but he does not recall observing hail damage. He testified that Chris Marlo and Doug Kramm were definitely on the roofs, because they told him that the roofs needed to be replaced, but he did not recall them saying that the roofs had been damaged by hail. Kessinger Dep. at 79:15-81:25. As with the roofs replaced in 2003, this testimony has enough of a factual basis to remove it from the realm of speculation, the Excess Carriers have not explained how the testimony will be prejudicial, and cross-examination is the appropriate remedy here, rather than the exclusion of testimony.

B.  *Excess Carriers' Motion to Exclude the Expert Testimony and Opinions of Plaintiffs' Expert Witness Greg Griffin*

The Excess Carriers move under <u>Daubert</u> to exclude the expert testimony and opinions of plaintiffs' witness Greg Griffin on the basis that Mr. Griffin's testimony and opinions "do not 'fit' the facts of the case."  The Excess Carriers state that plaintiffs have designed Mr. Griffin as an expert in this case to provide the following opinions, specifically connected to the October 24, 2001 hail storm: (1) "the force of hail as an airborne material in contact with a stationary object, in this case, a roof, caused fractures in the series of inorganic, built-up felts;" and (2) "repairs will not return the roofs to like kind and quality condition due to the extent of damage as documented and enclosed for each unit."  The Excess Carriers state that this action was filed in January 2007, more than five years after the hail event, plaintiffs did not retain Mr. Griffin until September 2007, and all of Mr. Griffin's opinions are based on four days that he spent at West Pointe in 2007.

The Excess Carriers assert that Mr. Griffin's testimony should be excluded because his inspection of the West Pointe roofs occurred six years after the hail storm, Mr. Griffin admitted he had no idea when what he called hail damage actually occurred, and consequently there is an analytic gap between what he observed in September 2007 and what may have occurred on October 24, 2001. The Excess Carriers argue that Mr. Griffin's inability to testify as to what alleged roof damage is actually a result of the October 24, 2001 hail storm renders his opinions irrelevant. They further argue Mr. Griffin's testimony is unhelpful because he has no basis to determine what, if any, damage to the roofs existed prior to October 24, 2001, he had no idea of the age of the roofs, and given the frequency of hail storms in the St. Louis area, he can provide no context for the hail damage he allegedly observed.

Plaintiffs respond that the motion to exclude Mr. Griffin's testimony is based on the unstated and faulty premise that Mr. Griffin must establish each element of plaintiffs' hail claim. Plaintiffs assert that Mr. Griffin's opinions are reliable and relevant, "fit" the voluminous other hail evidence in the case, and are admissible. Plaintiffs state that in December 2007, they identified three expert witnesses from CentiMark Corporation, including Mr. Griffin, as retained experts. Two of the CentiMark witnesses, Mr. Griffin and Mr. Hurley, inspected all fifty roof membranes that are at issue in the case.[2] The CentiMark inspection took four days, and included exhaustive visual observation of each roof and roof-mounted mechanical (AC) units, and photographs of each roof, mechanical unit, and representative observed "large" hail hits. CentiMark issued a report on December 10, 2007 following its inspection, detailing the nature and extent of the inspection and the resulting opinions.

Plaintiffs state that the principal inquiry must be whether Mr. Griffin's testimony is sufficiently reliable, citing First Union Nat'l Bank v. Benham, 423 F.3d 855, 861 (8th Cir. 2005). Plaintiffs assert that the factual basis of an expert's opinion goes to the credibility of the testimony, not its admissibility, and it is up to the opposing party to examine the factual basis for the opinion on cross examination. Id., 259 F.3d at 862. Plaintiffs assert that the following opinions of Mr. Griffin fit the facts of the case, and are clearly relevant to plaintiffs' hail claims: (1) the hundreds of circular marks that exist on the roof membranes at West Pointe are the result of hail hits; (2) the hail hits fractured the roof membranes at West Pointe; and (3) the roofs need to be replaced and cannot be effectively repaired.

---

[2]Plaintiffs explain state that although seventy-two buildings were in existence on October 24, 2001, they previously replaced fifteen roofs, five rubber-membrane roofs were not damaged by the hail storm, and two of the buildings were subsequently taken in an unrelated condemnation.

With respect to the Excess Carriers' arguments that Mr. Griffin's testimony should be excluded because he did not determine the date the observed hail damage occurred, the roof conditions as of October 24, 2001, and the age of the roofs on October 24, 2001, plaintiffs respond that Mr. Griffin and CentiMark were not retained to address these issues. Plaintiffs state that they have other evidence from several witnesses and numerous exhibits to connect the October 24, 2001 hail storm to the hail damage observed by CentiMark, and because the Excess Carriers had the right to inspect the roofs prior to issuing their policies, and chose not to do so, they have waived any argument or defense they otherwise may have had regarding the condition or age of the roofs.

The Court notes that the Excess Carriers do not assert Mr. Griffin is not qualified to offer the contested testimony and opinions. The Excess Carriers' motion focuses on the third <u>Daubert</u> factor, that the proposed evidence must be reliable or trustworthy in an evidentiary sense, specifically that "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

The Court finds that the Excess Carriers' objections to Mr. Griffin's testimony go to its weight rather than its admissibility. As stated above, Rule 702 "favors admissibility if the testimony will assist the trier of fact." <u>Clark</u>, 150 F.3d at 915. Doubt regarding "whether an expert's testimony will be useful should generally be resolved in favor of admissibility." <u>Id.</u> (citation and internal quotation omitted). Plaintiffs seek to offer Mr. Griffin's testimony to establish that the circular marks are the result of hail hits, that the hail hits fractured the roof membranes at West Pointe, and that the roofs must be replaced, rather than repaired. These are relevant issues and it appears this testimony would assist the trier of fact. The Court agrees with plaintiffs that there is no requirement for this

particular witness to offer testimony concerning when the hail damage occurred, roof conditions as of October 24, 2001, or the age of the roofs on October 24, 2001.

The Excess Carriers' objections to Mr. Griffin's testimony are properly resolved by means other than exclusion. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596. This motion will be denied.

C. *Lexington Insurance Company's Motion to Exclude the Expert Testimony and Opinions of Plaintiffs' Expert Witness Greg Griffin*

Lexington moves under Daubert to exclude the expert testimony and opinions of plaintiffs' witness Greg Griffin. As stated above, plaintiffs have designated Mr. Griffin as an expert in this case to offer the following opinions: (1) "the force of hail as an airborne material in contact with a stationary object, in this case, a roof, caused fractures in the series of inorganic, built-up felts;" and (2) "repairs will not return the roofs to like kind and quality condition due to the extent of damage as documented and enclosed for each unit."

Lexington asserts that Mr. Griffin's testimony should be excluded because (1) he lacks the knowledge, skill, experience, training and education to offer the opinion that hail fractured the felts on the roofs at West Pointe; (2) he did not apply any principles or methods to come to the opinion that hail fractured the felts at West Pointe, but rather conducted only a visual inspection, and did not know that laboratory tests exist which can verify hail damage to a roof; and (3) his testimony would not assist and would more likely confuse the trier of fact, because he first inspected the roofs at West Pointe six years after the alleged hail storm, does not know when hail struck the roofs at West Pointe, and has no opinion about the condition of the roofs at West Pointe in 2001.

With respect to Mr Griffin's qualifications, plaintiffs respond that Mr. Griffin and the other CentiMark representatives who inspected the West Pointe roofs are well qualified to give opinions with respect to hail damage and roof replacement versus repair issues. Mr. Griffin has been a roofing professional with CentiMark for over seventeen years, and during that time has personally inspected approximately 600 roofs, of which twenty-five to thirty percent were "built up" roofs such as at West Pointe, and of those "built up" roofs, approximately twenty percent, or thirty roofs, involved hail damage. During these inspections, Mr. Griffin visually inspected the roof membranes to determine if hail had fractured the membranes.

Plaintiffs offer Mr. Griffin's affidavit, which states in relevant part that based upon his years of experience in the roofing industry and in particular with hail damage to "built up" roofs, he can recognize hail damage to a "built up" roof by a visual inspection of the roof membrane. Specifically, Mr. Griffin avers that a large hail hit leaves a circular mark on the roof membrane's asphalt top layer, and when a hail hit fractures the "built up" roof membrane, spider web-like markings which radiate out from the center of the hit are generally present. Mr. Griffin avers that he can observe these spider web-like markings by a visual inspection of the roof membrane. Mr. Griffin avers that he personally visually observed hundreds of these spider web-like markings on West Pointe roofs with respect to the "large" hail hits recorded in the CentiMark report of December 10, 2007. Mr. Griffin also testified in his deposition that he was able to visually observe fractures in the roof felts.

With respect to Mr. Griffin's method of ascertaining hail damage, plaintiffs state that CentiMark representatives Mr. Griffin and Mr. Hurley personally inspected each of the 50 roofs at issue over a four-day period, conducting on-the-roof close visual observation of the roof membrane

of each roof, the roof-mounted mechanical (AC) units on each roof, photographs of the roof field and mechanical units on each roof, and photographs of representative large hail hits on each roof.

Plaintiffs assert that visual observation of the roof membrane is widely recognized as an appropriate method of ascertaining hail damage to a "built up" roof, noting that Lexington's hail expert, Mr. Koontz, testified that a membrane fracture sometimes can be determined by visual observation only, and Lexington's other hail expert, Mr. Cox, performed a visual inspection only and did not undertake any laboratory analyses. Plaintiffs also assert that in another lawsuit concerning hail damage to a "built up" roof, Mr. Cox testified that there are no existing written testing procedures to determine if a roof membrane has been cracked, and that two nationally recognized industry standards, Factory Mutual and Underwriters Laboratories, merely look at fractures in the surface to determine hail damage. Plaintiffs also state that in another hail damage case in this district, Gannon International, Ltd. v. National Union Fire Insurance Co., No. 4:04-CV-893 CDP, defendants' experts testified that visual observation alone can be sufficient to determine the nature and extent of hail damage.

Finally, with respect to Lexington's assertion that Mr. Griffin's testimony does not "fit" the facts of the case, plaintiffs respond that Mr. Griffin's testimony will assist and will not confuse the jury, as he will properly testify that (1) the hundreds of circular marks on the roof membranes at West Pointe are the result of hail hits; (2) the hail hits fractured the roof membranes at West Pointe; and (3) the roofs needs to be replaced and cannot effectively be replaced. In response to the defendants' assertions that Mr. Griffin's testimony fails to "fit" the facts because he did not inspect the roofs until six years after the alleged hail damage occurred, and he has no way to date the hail damage he claims to have observed, plaintiffs state that they have other evidence from several witnesses and numerous

exhibits to connect the October 24, 2001 hail storm to the hail damage observed by Mr. Griffin and CentiMark.

The Court finds that Mr. Griffin's extensive experience in the roofing industry gives him a specialized knowledge and skill that provides a sufficient basis to provide expert testimony on the issues identified by plaintiffs, regardless of whether he has a professional license or degree. An expert may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702; see Jaurequi v. Carter Mfg. Co., Inc., 173 F.3d 1076, 1081 (8th Cir. 1999). Rule 702 specifically contemplates that practical training and experience, as well as academic training and credentials, may be the basis of expert testimony. Federal Crop Ins. Corp. v. Hester, 765 F.2d 723, 728 (8th Cir. 1985). Lexington is free to cross-examine Mr. Griffin regarding his education and credentials.

The Court rejects Lexington's assertion that Mr. Griffin's opinions are based on nothing more than his subjective beliefs and assumptions. Mr. Griffin's opinions are based on his visual observations of marks on the membranes of the West Pointe roofs, which observations are supported by his experience with hail damage on similar "built up" roofs. Lexington's own expert Mr. Koontz conceded that a roof membrane fracture can be determined in some instances by visual observation only. Mr. Griffin has simply applied a different methodology to analyze the condition of the West Pointe roofs than did Lexington's expert. It will be a matter for the jury to decide which side's expert to believe.

Finally, the Court rejects Lexington's argument that Mr. Griffin's testimony fails to "fit" the facts of the case for the reasons discussed above, supra at 14, with respect to the Excess Carriers' motion to exclude his testimony. This motion will be denied.

D. *Plaintiffs' Motion to Strike and Exclude Defendants' Witness Reports, Testimony and Opinions of Jim Koontz and Wayne Cox*

1. <u>Mr. Koontz</u>

a. *Hail damage*

Plaintiffs move to exclude Mr. Koontz's testimony to the extent he expresses expert opinions about the condition of fifty-eight roofs at West Pointe that he did not inspect, and to strike and exclude Mr. Koontz's July 22, 2002 Report as to all testimony and opinions concerning the roofs not inspected by Mr. Koontz. Plaintiffs contend that Mr. Koontz's opinions as to the uninspected roofs are not based upon sufficient facts or data, are unreliable, and represent rank speculation.

Plaintiffs state that because West Pointe is a large complex including seventy-two roofs spread over approximate fifty-six acres, Mr. Koontz should be limited to giving opinions about hail damage to the fourteen roofs he inspected, but opinions as to the remaining fifty-eight roofs are unreliable and inadmissible. Plaintiffs note that the roofs were undisputedly available for Mr. Koontz to inspect, but he did not inspect them and any assumption that hail damage to the remaining roofs is the same as he observed on the fourteen roofs is rank speculation. Plaintiffs state that Mr. Koontz testified it is important to obtain as much reliable information as possible before rendering an opinion about hail damage in part because hailstorms and the size of resulting hail stones are random, that hail at a given site can vary, and he has seen project sites where "you can be a couple of hundred feet apart and have some differences." Koontz Dep. at 200:12-18.

Lexington responds that Mr. Koontz inspected the fourteen roofs at West Pointe which the insured told him were the most severely damaged by hail, and his opinion that hail did not damage the roofs at West Pointe is not based on an assumption, but rather on the insured's public adjuster's representation that the fourteen roofs he did inspect represented the worst damage to the West Pointe

roofs. Because he found no hail damage on the fourteen roofs he examined, and had been told by the insured that those roofs represented the worst hail damage, he concluded that none of the roofs at West Pointe were damaged by hail. Lexington also notes that the roofs Mr. Koontz inspected were not clustered together or isolated in a corner, but rather were in Phases II, III and IV of the West Pointe complex.

Lexington notes that plaintiffs do not challenge Mr. Koontz's qualifications and methodology. Lexington states that Mr. Koontz conducted a representative inspection and sampling of the West Pointe roofs, and after careful consideration and laboratory analysis, concluded that the roofs had not been damaged by hail. Lexington asserts that an expert may draw conclusions based on a representative sampling, the circumstances, and the expert's previous experience, qualifications and methodology, and is not limited to opining about the results of an inspection, but may extrapolate known facts into an opinion about conditions the expert has not actually inspected, citing United States v. Bailey, 516 F.Supp.2d 998, 1010 (D. Minn. 2007). Thus, Lexington concludes that Mr. Koontz may properly extrapolate from his representative inspection to conclude that the roofs at West Pointe were not damaged by hail when he inspected them in June 2002.

Plaintiffs reply that a public insurance adjuster (Adjusters International) and not the apartment complex owners advised Mr. Koontz which roofs were purportedly the most severely damaged in 2002, so it is not appropriate for Lexington to contend that the plaintiffs designated certain roofs for Mr. Koontz to inspect as the most damaged.

Plaintiffs further reply that in December 2007 they designated CentiMark as a retained expert and disclosed its report including the opinion that all of the West Pointe roofs were hail damaged and needed to be replaced. Subsequently, with knowledge of this opinion, Lexington designed Mr.

Koontz as a retained expert. Prior to Mr. Koontz's deposition, Lexington advised plaintiffs which roofs he wished to inspect. Plaintiffs assert that although Mr. Koontz could have inspected any or all of the roofs, he chose not to inspect any of the fifty-eight roofs he had not previously inspected, although he knew plaintiffs were claiming that each roof was hail damaged and in need of replacement.

Plaintiffs state that the <u>Bailey</u> case on which Lexington relies is distinguishable, because the trial court's decision, that the proffered ecology expert could opine as to soil wetland conditions even though he had not tested a specific area of the soil at issue, rested in part on the fact that the expert had obtained corroborating information from secondary sources. 516 F.Supp.2d at 1010. Plaintiffs state that in contrast, Mr. Koontz did not obtain any corroborating information in support of his limited inspection opinions, and admittedly ignored or failed to consider other relevant data from a variety of authoritative sources including the HailTrax report, pictures of the hail stones at West Pointe, testimony of eyewitnesses to the hail storm at West Pointe, and the fact that the roofs began to leak after the October 24, 2001 hail storm.

Plaintiffs also suggest that in Mr. Koontz's non-testifying professional capacity he would never rely on a limited inspection of less than twenty percent of the roofs at the fifty-six acre apartment project, ignore or failure to consider voluminous contrary hail data including subsequent roof leaks, and then advise a client that none of the remaining uninspected eighty percent of the roofs had suffered any hail damage.

Plaintiffs' motion focuses on the third <u>Daubert</u> factor, that the proposed evidence must be reliable or trustworthy in an evidentiary sense. Fed. R. Evid. 702. The Court finds that plaintiffs' objections to Mr. Koontz's testimony go to its weight rather than its admissibility. As stated above,

Rule 702 "favors admissibility if the testimony will assist the trier of fact." Clark, 150 F.3d at 915. Doubt regarding "whether an expert's testimony will be useful should generally be resolved in favor of admissibility." Id. (citation and internal quotation omitted). Mr. Koontz's background and experience combined with his inspection of the fourteen roofs provides a basis for him to give an opinion as to the condition of all the roofs, based on extrapolation from his actual observations. Plaintiffs' objections to Mr. Koontz's testimony are properly resolved by means other than exclusion. Plaintiffs are free to offer evidence and argument to the jury concerning the weaknesses they identify in the factual foundation of Mr. Koontz's testimony. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596. This motion will be denied.

### b. *Installation*

Plaintiffs also seek to exclude Mr. Koontz's testimony, with respect to the fifty-eight uninspected roofs, that the roofing systems at West Pointe were installed in a "grossly deficient manner" and that the "defective methods used in construction are resulting in roof leaks." As with the issue of hail damage, plaintiffs assert that Mr. Koontz's opinions concerning roof installation on the fifty-eight roofs he did not inspect are rank speculation. Plaintiffs assert that this is particularly true because the West Pointe complex consists of four separate phases built at different times. Plaintiffs also point out that of the fourteen roofs Mr. Koontz did inspect, he opined that two were not defectively installed. Plaintiffs contend that because Mr. Koontz determined two of the fourteen roofs were not deficiently installed, there is no reliable foundation for any opinions as to the

installation of the uninspected roofs. The defendants do not respond to this aspect of Plaintiffs' motion.

The Court finds there is no factual basis in the record for testimony by Mr. Koontz concerning whether roofs he did not inspect were deficiently installed, and any such testimony would be improper and speculative. This aspect of plaintiffs' motion should therefore be granted. Mr. Koontz's expert report will be excluded to the extent it contains any statements or opinions concerning alleged deficiencies in the installation of roofs he did not inspect.

### 2. Mr. Cox

Plaintiffs move to exclude the expert testimony of Wayne Cox on several issues: (1) the frequency of hail in the St. Louis area; (2) opinions about approximately sixty-eight roofs at West Pointe that he did not inspect; and (3) opinions about a purported lack of hail damage on the approximately four roofs at West Pointe that he did inspect.[3]

#### a. *Frequency of Hail*

Plaintiffs assert that Mr. Cox, a roofer, is not qualified to express expert opinions as to the frequency of hail in the St. Louis area. Plaintiffs state that Mr. Cox holds a GED and a high school diploma, attended two semesters at a community college but did not obtain a degree, and has never taken a course in meteorology. Plaintiffs assert that Mr. Cox's twenty-plus years' experience as a roofer in the St. Louis area does not qualify him to render meteorological opinions about the frequency of hail in the St. Louis area.

Lexington does not respond to this aspect of plaintiffs' motion. It is clear that Mr. Cox is not a meteorologist and would not be able or qualified to testify as such. It is possible, however, that a

---

[3]It is not clear to the Court whether Mr. Cox inspected three or four roofs at West Pointe.

roofer with twenty years' experience in the St. Louis area would be able to testify, based on his recollection or a review of business records, how often significant hail events have occurred during that time, or how often he has been called upon to inspect roofs for hail damage during that time. The Court will deny this aspect of plaintiffs' motion without prejudice.

### b. *Installation Deficiencies in Sixty-Eight Roofs*

Plaintiffs state that Mr. Cox intends to testify that the roofs he inspected at West Pointe in April 2002 were improperly installed. To the extent Mr. Cox intends to expand that opinion to the sixty-eight roofs he did not inspect, plaintiffs seek to exclude such testimony as unreliable and speculative.

Lexington did not respond to this aspect of plaintiffs' motion. There is no factual basis in the record for testimony by Mr. Cox that any of the sixty-eight roofs he did not inspect were defectively or deficiently installed, and such testimony would be speculative. The Court finds that this aspect of plaintiffs' motion should be granted.

### c. *Lack of Hail Damage on Four Roofs*

Finally, plaintiffs seeks to exclude as unreliable Mr. Cox's testimony that the four buildings he did inspect do not require replacement due to hail damage. Plaintiffs state that Mr. Cox was engaged by an adjuster acting on behalf of Lexington to inspect the roofs for wind damage, not hail damage, and that he did not test the buildings for hail damage. Plaintiffs state that Mr. Cox's April 15, 2002 report to the adjuster does not mention hail, and assert that his "after-the-fact, litigation driven opinions as to the purported lack of hail are not based on sufficient facts or data, and are unreliable."

Lexington responds that Mr. Cox was hired to inspect the roofs and report back on whether they could be repaired, and to estimate what the repairs would cost. Lexington notes that plaintiffs do not challenge Mr. Cox's qualifications to determine whether or not the roofs at West Pointe were damaged by hail. Lexington states that Mr. Cox found no hail damage on the roofs he inspected at West Pointe, and asserts that the reason why he was on the roofs is irrelevant. Lexington cites Mr. Cox's testimony that he can't recall if he was specifically asked to look for hail damage, but did testify that "our moneymaker is hail. If there was hail, I would be all over it." Cox Dep. at 89:9-15.

Plaintiffs reply that Lexington's argument is circular and illogical: because Mr. Cox did not find what he was not looking for (hail), his hail opinions are somehow reliable. Plaintiffs also challenge the reliability of Mr. Cox's testimony quoted above, noting that he was hired by the insurance carrier, not the apartment complex owner, and if Mr. Cox had unilaterally and without invitation reported hail damage to an insurance client, when his charge was to inspect for wind damage, the insurer presumably and justifiably would have been upset. Plaintiffs state it is beyond dispute that a finding of hail damage to the roofs would have been adverse to Lexington's interests, and it is not credible to presume that Mr. Cox would have unilaterally inspected for or reported such an adverse condition.

The Court finds that plaintiffs' objections to this aspect of Mr. Cox's testimony go to its weight rather than its admissibility. Doubt regarding "whether an expert's testimony will be useful should generally be resolved in favor of admissibility." Clark, 150 F.3d at 915 (citation and internal quotation omitted). Mr. Cox's background and experience combined with his inspection of the four roofs provides a basis for him to give an opinion as to the condition of those roofs, based on his actual observations. Plaintiffs' objections to Mr. Cox's testimony are properly resolved by means

other than exclusion. Plaintiffs are free to offer evidence and argument to the jury challenging the accuracy of and motivation for Mr. Cox's testimony. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596. This motion will be denied.

**Conclusion**.

For the foregoing reasons, the Excess Carriers' motions to exclude opinions and testimony of plaintiffs' expert witnesses Robin Kessinger and Greg Griffin should be denied. Defendant Lexington's motion to exclude the testimony and opinions of Greg Griffin should also be denied.

Plaintiffs' motion to exclude the testimony of Jim Koontz should granted with respect to testimony and opinions by Mr. Koontz concerning installation defects in the fifty-eight roofs he did not inspect, and denied in all other respects. Mr. Koontz's expert report will be excluded to the extent it contains any statements or opinions concerning alleged deficiencies in the installation of roofs he did not inspect.

Plaintiffs' motion to exclude the testimony of Wayne Cox should be granted with respect to testimony and opinions by Mr. Cox concerning installation defects in the sixty-eight roofs he did not inspect, denied without prejudice with respect to testimony by Mr. Cox concerning the frequency of hail in the St. Louis area, and denied in all other respects.

Accordingly,

**IT IS HEREBY ORDERED** that the Excess Carriers' Motion to Exclude Certain Opinions and Testimony of Plaintiffs' Expert Witness Robin Kessinger is **DENIED**. [Doc. 49]

**IT IS FURTHER ORDERED** that the Excess Carriers' Motion to Exclude the Expert Testimony and Opinions of Plaintiffs' Expert Witness Greg Griffin is **DENIED**. [Doc. 51]

**IT IS FURTHER ORDERED** that defendant Lexington Insurance Company's motion to exclude the expert testimony and opinions of plaintiffs' expert witness Greg Griffin is **DENIED**. [Doc. 53]

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Strike and Exclude Defendants' Witness Reports, Testimony and Opinions of Jim Koontz and Wayne Cox is **GRANTED in part** and **DENIED in part** as set forth above; said motion is **GRANTED** with respect to testimony and opinions by Mr. Koontz concerning installation defects in the fifty-eight roofs he did not inspect, and with respect to testimony by Mr. Cox concerning installation defects in the sixty-eight roofs he did not inspect, **DENIED without prejudice** with respect to testimony by Mr. Cox concerning the frequency of hail in the St. Louis area, and **DENIED** in all other respects. [Doc. 54]

**IT IS FURTHER ORDERED** that Mr. Koontz' expert report is excluded to the extent it contains any statements or opinions concerning alleged deficiencies in the installation of the fifty-eight roofs he did not inspect.


_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**


Dated this __6th__ day of August, 2008.